# United States Court of Appeals for the Federal Circuit

04-1452

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM,
on behalf of THE UNIVERSITY OF TEXAS AT AUSTIN,
and HYDRO-QUEBEC,

Plaintiffs-Appellees,

v.

NIPPON TELEPHONE AND TELEGRAPH CORPORATION,

Defendant-Appellant.

James S. Renard, Bickel & Brewer, of Dallas, Texas, argued for plaintiffs-appellees. With him on the brief were William A. Brewer III, Joyce M. Hellstern, and Garreth A. Sarosi. Of counsel was Daniel F. Perez.

Gerald C. Conley, Andrews Kurth LLP, of Dallas, Texas, argued for defendant-appellant. Of counsel on the brief were Timothy E. Taylor, Bernard H. Masters, and Tonya M. Gray. Also of counsel on the brief were Kendall M. Gray and Anthony F. Matheny, of Houston, Texas.

Appealed from: United States District Court for the Western District of Texas

Judge Sam Sparks

# United States Court of Appeals for the Federal Circuit

04-1452

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM,
on behalf of THE UNIVERSITY OF TEXAS AT AUSTIN,
and HYDRO-QUEBEC,

Plaintiffs-Appellees,

v.

NIPPON TELEPHONE AND TELEGRAPH CORPORATION,

Defendant-Appellant.

_____

DECIDED:  July 13, 2005

_____

Before SCHALL, GAJARSA, and LINN, Circuit Judges.

GAJARSA, Circuit Judge.

Nippon Telephone and Telegraph Corporation ("NTT") appeals from an order by the United States District Court for the Western District of Texas denying NTT's motion to dismiss a suit filed by the Board of Regents of the University of Texas System ("UT") and Hydro-Quebec ("HQ").  Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp., Case No. A-01-CA-478 (W.D. Tex. June 1, 2004) (the "Order").  The Order denied NTT's motion to dismiss on grounds of sovereign immunity, a decision that NTT asserts is appealable under the "collateral order" doctrine established by Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949).  Because we conclude that this case does not fall within the jurisdiction of this court, we fail to reach the issue as to

whether the Order is appealable. Accordingly, pursuant to 28 U.S.C. § 1631, we transfer NTT's appeal to the United States Court of Appeals for the Fifth Circuit for resolution of the issues raised therein.

## I. BACKGROUND

NTT is the largest telecommunications company in Japan. NTT was created in 1985 when the telecommunications industry was privatized and its predecessor, Nippon Telegraph and Telephone Public Corporation, was dissolved.

In October 1993, NTT and UT entered into an agreement whereby an NTT scientist was given permission to work for one year as a visiting scientist in UT's Center for Materials Science and Engineering. During his tenure, the NTT scientist worked with Dr. John B. Goodenough, a UT professor and an expert in lithium phosphate cathode materials designed primarily for use in rechargeable batteries. According to the terms of the agreement between NTT and UT, "any information, ideas, discoveries, applications, research, inventions, and work product generated by the [NTT] scientist, directly or indirectly, or with which he became familiar as a result of his stay, were the exclusive property of [UT]."

While at UT, the NTT scientist was involved in research on a compound to be used as cathodes in high-performance batteries. In 1996, UT filed for United States patent protection on the product of this research which it identified in its application as "cathode materials for secondary (rechargeable) Lithium batteries," commonly referred to as $LiFePO_4$. In 1999, UT obtained U.S. Patent No. 5,910,382 ("the '382 patent") covering its $LiFePO_4$ invention. In January 1997, while the application for the '382

04-1452                                    2

patent was pending, UT entered into a licensing agreement giving HQ exclusive rights to make and use $LiFePO_4$.

According to UT, in November 1995, the NTT scientist and NTT applied for Japanese patent protection based on the research into $LiFePO_4$ that the NTT scientist was exposed to while at UT. UT asserts that such use of its confidential and proprietary technology was a misappropriation of UT's intellectual property and constituted a breach of the agreement by which the NTT scientist was given access to that proprietary information.

On June 15, 2001, UT and HQ (collectively, "Plaintiffs") filed suit against NTT in the 126th Judicial District Court of Travis County, Texas. Plaintiffs' complaint (the "Complaint") asserted state law claims for breach of confidential relationship, conversion, breach of contract, statutory and common law misappropriation of trade secrets, breach of fiduciary duty, tortious interference, unfair competition, and civil conspiracy.[*] The relief sought in the Complaint included actual damages, punitive

---

[*] Plaintiffs subsequently filed three amended complaints, which included varying combinations of an additional state law claim for business disparagement and a claim for violation of the Lanham Act. As NTT correctly points out, these additional claims are not for our consideration as we resolve the primary issue before us, namely whether NTT's subsequent removal of the action to federal court was proper. It is only the pleading operative at the time the petition to remove was filed, i.e., the Complaint, that is relevant to determining NTT's right to remove. Pullman Co. v. Jenkins, 305 U.S. 534, 537 (1939). Because Plaintiffs have contested the propriety of NTT's removal prior to entry of final judgment, this case is distinguishable from the line of cases considering only whether federal jurisdiction is proper. See Pegram v. Herdrich, 530 U.S. 211, 215-16 (2000) (distinguishing questions of jurisdiction raised after entry of final judgment from uncontested issues related to the propriety of removal); Grubbs v. Gen. Elec. Credit Corp., 405 U.S. 699, 700 (1972) (holding that a challenge to the validity of the removal procedure may not be raised for the first time on appeal); Mackay v. Uinta Dev. Co., 229 U.S. 173, 176 (1913) (holding that a plaintiff who failed to challenge removal procedures prior to entry of final judgment effectively waived the right to claim that

damages, attorneys' fees under state law, disgorgement of profits collected by NTT in relation to the UT technology and a constructive trust over the Japanese patent for the benefit of UT. The Complaint also sought a permanent injunction ordering NTT to turn over all materials containing any purloined proprietary information and to refrain from using or disseminating any such information or engaging in any conduct that interferes with Plaintiffs' business relationships.

On July 23, 2001, NTT filed a notice to remove the case to the United States District Court for the Western District of Texas. NTT initially sought removal of the case on the basis of 28 U.S.C. § 1331, which grants district courts original jurisdiction over questions arising under federal law, and 28 U.S.C. § 1338(a), which grants district courts original jurisdiction over civil actions arising under U.S. patent laws. On October 15, 2001, NTT filed a Supplemental Notice of Removal that asserted as an additional basis for removal 28 U.S.C. § 1330, which grants district courts original jurisdiction over civil actions against a foreign state. Plaintiffs filed a motion to remand the case to state court.

On November 26, 2001, the district court issued an order denying the motion to remand on the grounds that it had jurisdiction under 28 U.S.C. § 1338(a). In so holding, the court found that Plaintiffs' claim for tortious interference with business opportunity required UT to "show that the '382 patent overlaps the subject matter of NTT's Japanese patent. This requires an interpretation of the '382 patent, which is a substantial question of federal law." Citing U.S. Valves, Inc. v. Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000), and Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d

irregularities in the removal process deprived the court of jurisdiction over a case otherwise properly before it).

1318, 1325 (Fed. Cir. 1998), overruled in part on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1361 (Fed. Cir. 1999), the court determined that it had jurisdiction under 28 U.S.C. § 1338(a), because there was no theory by which Plaintiffs' claim for tortious interference could be established that would not implicate federal patent law.  Because the court found that it had jurisdiction over one of Plaintiffs' state law claims, it determined that it had supplemental jurisdiction to hear Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.  In its November 26, 2001 order, the district court also denied NTT leave to supplement its removal notice to include 28 U.S.C. § 1330 as a basis for jurisdiction on the ground that NTT had not shown cause for failing to comply with the timing requirement of 28 U.S.C. § 1446(b).

On March 26, 2004, nearly three years after removing the case, NTT filed a motion to dismiss on the ground of sovereign immunity.  On June 1, 2004, the district court concluded that NTT is not entitled to foreign sovereign status and therefore not entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq.  Accordingly, the court denied NTT's motion to dismiss.  It is from the court's June 1, 2004 order that NTT appeals.

On July 16, 2004, UT and HQ filed a motion to dismiss NTT's appeal for lack of jurisdiction.  A single judge of this court denied that motion without prejudice stating that "[w]e deem the better course is to have the parties address this issue in their briefs." Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp. 04-1452 (Fed. Cir. Aug. 16, 2004).  The issue of this court's jurisdiction over NTT's appeal is now squarely before us.

04-1452                                                      5

## II. DISCUSSION

NTT seeks to invoke this court's jurisdiction under the terms of 28 U.S.C. § 1295(a)(1), which enables this court to hear appeals from a district court "if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title." The threshold issue to be resolved, then, is whether or not the district court properly exercised jurisdiction over this case pursuant to 28 U.S.C. § 1338(a). This court's review of jurisdictional determinations is plenary. Hunter Douglas, 153 F.3d at 1325.

### A. Jurisdiction Under Section 1338(a)

According to the terms of the statute, jurisdiction exists under section 1338(a) if an action "arises under" the federal patent laws. Therefore, jurisdiction extends "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law in that patent law is a necessary element of one of the well-pleaded claims." Christianson v. Colt, 486 U.S. 800, 809 (1988). As we have stated, "[a] court must review and analyze the plaintiff's pleadings, with special attention directed to the relief requested by the plaintiff, in making the determination as to whether a cause of action arises under the patent laws." Air Prod. & Chem., Inc. v. Reichhold Chem., Inc., 755 F.2d 1559, 1562 (Fed. Cir. 1985).

Here there is no question that the claims framed in the Complaint assert only causes of action created by the state law of Texas and not the federal patent laws. Accordingly, the issue becomes whether the state law claims asserted or the relief requested by Plaintiffs "necessarily depends on resolution of a substantial question of federal patent law." Christianson, 486 U.S. at 809.

NTT identifies only one of Plaintiffs' state law claims that it argues requires the resolution of substantial questions of patent law: the claim for tortious interference with business opportunity and prospective economic advantage. Under Texas law, the elements of tortious interference with prospective business relations are:

> (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did the act with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the interference.

Ash v. Hack Branch Distrib. Co., 54 S.W.3d 401, 414-15 (Tex. App. 2001). To satisfy the second element, the plaintiff must prove that the defendant's conduct would be actionable under an independent tort, but need not prove all the elements of the independent tort. Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 726 (Tex. 2001).

Here Plaintiffs allege that NTT improperly took proprietary information belonging to UT and adopted it as its own thereby interfering with Plaintiffs' expectations of capitalizing on the inventions. Included in the Complaint is an exemplary list of the economic opportunities allegedly interfered with by NTT: "(a) excluding others from making, using, selling, offering for sale, or importing into the United States batteries of the type disclosed in the '382 patent; (b) benefiting financially from licenses; and (c) commercializing the technology."

NTT claims that in order for Plaintiffs to establish that they had the requisite reasonable probability of a contractual relationship, substantial questions of U.S. patent law would need to be resolved. First, according to NTT, Plaintiffs would have to show that UT is the rightful inventor of $LiFePO_4$ and owner of the '382 patent and that the '382

patent is valid. Second, in order to claim that NTT's Japanese patent application interfered with Plaintiffs' business expectancies, Plaintiffs would have to show that the Japanese patent reads onto the '382 patent. Accordingly, NTT asserts that Plaintiffs' tortious interference claim raises issues related to the inventorship, validity, enforceability, and interpretation of the '382 patent. In support of its assertion, NTT points to this court's precedent wherein the issues identified were deemed to present substantial questions of patent law. Univ. of Colo. Found. v. Am. Cyanamid Co., 196 F.3d 1366, 1372 (Fed. Cir. 1999) (holding that plaintiffs' claim of equitable title to a U.S. patent required determination of the rightful inventor of the patented technology, which presented a substantial question of patent law); Hunter Douglas, 153 F.3d at 1329 (holding that plaintiff raised a substantial question of patent law by alleging that defendants engaged in an injurious falsehood when the falsehood identified was that defendants held exclusive rights to the patented invention; in order to prove its claims plaintiff had to show that the subject patent was invalid); U.S. Valves, 212 F.3d at 1372 (holding that in order to succeed on its breach of contract action, the terms of the contract required that plaintiff show that certain of defendant's products infringed its patents; accordingly, patent law was a necessary element of plaintiff's breach of contract action).

NTT correctly asserts that this court has held that issues of inventorship, infringement, validity and enforceability present sufficiently substantial questions of federal patent law to support jurisdiction under section 1338(a). Hunter Douglas, 153 F.3d at 1330-31. NTT is incorrect, however, in asserting that such issues are raised by Plaintiffs' claim for tortious interference. This is so primarily because the

patent law issues identified by NTT are not essential to the resolution of Plaintiffs' claim. Contrary to NTT's assertion, Plaintiffs would not need to prove that the '382 patent is valid in order to establish the business expectancy element of its well-pled tortious interference claim. Issued patents are presumed valid absent proof to the contrary and UT, as the patentee of the '382 patent, is entitled to the benefit of that presumption. 35 U.S.C. § 282; Speedco, Inc. v. Estes, 853 F.2d 909, 913 (Fed. Cir. 1988) (determining that a plaintiff could rely on the statutory presumption of validity in establishing an element of his well-pled contract claim). Similarly, a determination of the true inventor of $LiFePO_4$ may give rise to future claims regarding the validity of the '382 patent, but the presence of a possible question of inventorship does not convert the state law action into one arising under the patent laws. Consol. World Housewares, Inc. v. Finkle, 831 F.2d 261, 265 (Fed. Cir. 1987) ("That a contract action may involve a determination of the true inventor does not convert that action into one 'arising under' the patent laws.").

NTT also asserts that the court is required to construe the '382 patent in order to determine if NTT's conduct interfered with Plaintiffs' business opportunities. NTT's argument relies heavily on our holding in U.S. Valves. That reliance is misplaced. In U.S. Valves, Dray, the patentee, granted to U.S. Valves the exclusive right to manufacture, use, sell, advertise and distribute the patented invention. 212 F.3d at 1370. After relations between the parties broke down, U.S. Valves sued Dray claiming breach of contract due to his manufacture and sale of products allegedly covered by the license agreement. Id. at 1371. We held that U.S. Valves' breach of contract action raised substantial issues of patent law, because in order for U.S. Valves to succeed on

its claim, it must first show that the valves sold by Dray were within the scope of the subject patents. Id. at 1372. Although the court in U.S. Valves found that the breach of contract action at issue required a determination as to whether the defendant's actions infringed the subject patent, the case does not stand for the proposition that all breach of contract actions involving patents require such a determination. NTT, however, attempts to find broad meaning in the holding of U.S. Valves divorced from its factual context. NTT analogizes to U.S. Valves and argues that Plaintiffs' claim for interference with business opportunities related to the commercialization of the '382 patent requires that Plaintiffs first show that NTT's Japanese patent overlaps with the '382 patent. To the contrary, Texas law requires only that Plaintiffs establish that NTT's alleged conduct, improperly claiming ownership of UT's proprietary technology by filing the Japanese patent application, constituted an independent tort that prevented Plaintiffs from entering into contracts. The construction and scope of the terms of the '382 patent are irrelevant to showing that the technology on which the Japanese patent is based was misappropriated from UT.

This case is very similar to two cases in which this court found that the state law claims asserted did not "arise under" federal patent law. In American Telephone & Telegraph Co. v. Integrated Network Corp., 972 F.2d 1321, 1322 (Fed. Cir. 1992), American Telephone & Telegraph Co. ("AT&T") sued Integrated Network Corporation ("INC") and four of its employees alleging that the INC employees, while employed at AT&T, had conceived of an invention that they had assigned to INC. Id. INC had obtained a U.S. patent on the disputed invention. Id. In its suit, AT&T sought to obtain title to the patent by asserting state law claims for breach of contract; breach of fiduciary

duty; misuse and misappropriation of proprietary information; and inducing breach of contract and misuse and misappropriation of proprietary information. Id. We determined that all four counts of AT&T's complaint stemmed from the same allegation: that the employees breached an Agreement for Assignment of Inventions that each individually entered into with AT&T. Id. at 1324. The court determined that the terms of the agreements did not extend only to patentable inventions and therefore AT&T could "rely on one theory with patent connotations, and on another theory involving no patent question." Id. Because no patent issue was necessary to AT&T's claim, this court reversed a district court holding that jurisdiction over the case was proper under section 1338(a). Id.

We reached a similar result in Uroplasty, Inc. v. Advanced Uroscience, Inc., 239 F.3d 1277 (Fed. Cir. 2001). Uroplasty alleged that its former CEO had filed a patent application as co-inventor of a technology based on an Uroplasty trade secret. Id. at 1279. The claims at issue in Uroplasty were for misappropriation of trade secrets, breach of fiduciary duty and breach of contract under Minnesota law. Id. Advanced Uroscience removed the action from state court citing an interference Uroplasty had attained against the subject patent. Id. Advanced Uroscience argued that the interference "'called into question whether such Application and Patent make use of or are in any way based upon confidential information and trade secrets of Uroplasty [and] . . . by the nature of the claimed misappropriation . . . raised issues relating to an Application for a United States Patent and the issuance of a United States Patent' thereby alleging causes of action under 28 U.S.C. 1338(a)." Id. We vacated the district court's finding of jurisdiction on the grounds that while the cited patent "may be

evidence in support of Uroplasty's allegations . . . the mere presence of the patent does not create a substantial issue of patent law." Id. at 1280.

In Uroplasty and AT&T, the plaintiffs raised contract and misappropriation claims that implicated U.S. patents, yet we found that resolution of those state law claims were not sufficient to establish jurisdiction under section 1338(a). In the case at hand, the state law claims raised by Plaintiffs are one step further removed in that they implicate the validity not of a U.S. patent, but of a patent issued under Japanese law. The fact that UT owns a U.S. patent on the invention allegedly misappropriated may be evidence of its claims, but the presence of the patent does not require resolution of a substantial question of U.S. patent law. See Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1574 (Fed. Cir. 1997) (holding that a complaint alleging breach of a patent assignment and royalty agreement does not state a claim arising under the patent laws even though a consequence of finding such a breach may lead to allegations of infringement); Speedco, 853 F.2d at 913 (holding that "the fact that patent issues are relevant under state contract law to the resolution of a contract dispute cannot possibly convert a suit for breach of contract into one 'arising under' the patent laws as required to render the jurisdiction of the district court based on section 1338." (internal citation omitted)); Consol. World Housewares, 831 F.2d at 265 ("the mere presence of a patent issue cannot of itself create a cause of action arising under the patent laws"); Ballard Med. Prod. v. Wright, 823 F.2d 527, 531 (Fed. Cir. 1987) (same).

Consideration of the relief requested by the Complaint does not change our conclusion. NTT asserts that it was improper for Plaintiffs to seek an injunction prohibiting NTT from disseminating information disclosed in the '382 patent because its

trade secret claims were extinguished when it filed the patent application. NTT grounds its challenge to the Plaintiffs' injunction in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989). In Bonito Boats, the Supreme Court struck down as preempted a Florida law that protected for an unlimited number of years boat hull designs without regard for whether the designs had been denied patent protection, were protected by an expired patent, or had been freely revealed to the public by their creators. 489 U.S. at 159. Unquestionably the Court in Bonito Boats distinguished between protection afforded inventors under federal patent laws and state trade secret laws and held that states could not provide trade secret protection that conflicted with the federal patent scheme. Id. at 151. The Court did not, however, hold that patent laws preempt a patentee's right to recover under theories sounding in either contract or tort for misappropriation of property protected under state law at the time of its misappropriation. Nothing in the injunction requested by Plaintiffs would improperly expand the scope of rights granted under the '382 patent and Plaintiffs' quest for such an injunction does not require resolution of a substantial question of patent law.

For the reasons stated above, the district court erred in holding that it had jurisdiction to hear this case pursuant to 28 U.S.C. § 1338(a). Because this court's jurisdiction is premised on the district court's exercise of jurisdiction under section 1338(a), this court does not have jurisdiction to hear NTT's appeal.

B.     Transferability of the Appeal

NTT asserts that in the event that we do not have jurisdiction to hear its appeal, the appeal should be transferred to the Fifth Circuit. NTT raises a procedural issue to preserve its appeal. NTT's original Notice of Removal was based exclusively on

28 U.S.C. §§ 1331 and 1338(a), but it filed a Supplemental Notice of Removal on October 15, 2001, that included a claim for removal jurisdiction based on 28 U.S.C. § 1330. The district court found jurisdiction under NTT's original Notice of Removal and dismissed NTT's motion to file its Supplemental Notice of Removal on the grounds that it was untimely and NTT had failed to show cause as to why, as required by 28 U.S.C. § 1441(d). NTT argues that its Supplemental Notice of Removal was not untimely because NTT had not been properly served under the Hague Convention and therefore the thirty day removal period had not yet begun to run. See Murphy Bros. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350-51 (1999) (holding that "service of process is the official trigger for responsive action by an individual or entity named defendant"). NTT initially raised this issue in its Supplemental Notice of Removal, but did not pursue it after the district court found jurisdiction based on its original Notice of Removal.

NTT presents a colorable argument that its Supplemental Notice of Removal was timely and therefore preserved its claim to removal jurisdiction under 28 U.S.C. § 1330. Accordingly, because NTT presents an alternative jurisdictional argument capable of being heard by the Fifth Circuit, it is in the interest of justice to transfer the appeal to that court pursuant to 28 U.S.C. § 1631. It will then be for the Fifth Circuit to determine if NTT properly raised its additional basis for removal jurisdiction and if it is appropriate to reach NTT's claim for sovereign immunity.

## III.    CONCLUSION

For the foregoing reasons, we conclude that this court does not have jurisdiction to hear NTT's appeal. Pursuant to 28 U.S.C. § 1631, we transfer the appeal to the United States Court of Appeals for the Fifth Circuit.

<u>TRANSFERRED.</u>

IV.    COSTS

Each party shall bear its own costs.